221 F.3d 472 (3rd Cir. 2000)
 JOSEPH MAIO; JO ANN MAIO; and GARY BENDER, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED
v.
AETNA INC.; AETNA-US HEALTHCARE, INC; AETNA-U.S. HEALTHCARE OF ARIZONA INC.; AETNA-U.S. HEALTHCARE OF CALIFORNIA INC.; AETNA-U.S. HEALTHCARE INC. (COLORADO); AETNA HEALTH PLANS OF SOUTHERN NEW ENGLAND, INC.; AETNA-U.S. HEALTHCARE, INC. (DELAWARE); AETNA-U.S. HEALTHCARE INC. (FLORIDA); AETNA-U.S. HEALTHCARE OF GEORGIA INC.; AETNA-U.S. HEALTHCARE OF ILLINOIS; AETNA-U.S. HEALTHCARE INC. (KENTUCKY); AETNA-U.S. HEALTHCARE INC. (LOUISIANA); AETNA-U.S. HEALTHCARE INC. (MASSACHUSETTS); AETNA-U.S. HEALTHCARE INC. (MICHIGAN); AETNA-HEALTH PLANS OF NEW JERSEY, INC.; AETNA-U.S. HEALTHCARE INC. (NEW YORK); AETNA-U.S. HEALTHCARE OF THE CAROLINAS; AETNA-U.S. HEALTHCARE INC. (OHIO); AETNA-U.S. HEALTHCARE INC. (PENNSYLVANIA); AETNA HEALTH PLANS OF CENTRAL AND EASTERN PENNSYLVANIA, INC.; AETNA HEALTH PLANS OF WESTERN PENNSYLVANIA, INC; AETNA HEALTH PLANS OF TENNESSEE, INC.; AETNA-U.S. HEALTHCARE INC. (TEXAS); AETNA-U.S. HEALTHCARE OF NORTH TEXAS INC.; AETNA-U.S. HEALTHCARE INC. (VIRGINIA); AETNA- U.S. HEALTHCARE OF WASHINGTON INC. JOSEPH MAIO; JO ANN MAIO; GARY BENDER, Appellants
 No. 99-1854
 UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT
 Argued June 19, 2000
Filed August 11, 2000
 
 1
 On Appeal from the United States District Court for the Eastern District of Pennsylvania (D.C. Civ. No. 99-1969), District Judge: Honorable John P. FullamAttorneys for Appellants: Edith M. Kallas (argued) David J. Bershad Patricia M. Hynes Charles S. Hellman Milberg Weiss Bershad Hynes & Lerach LLP One Pennsylvania Plaza 49th Floor New York, New York 10119, James J. Binns The Mellon Bank Center 39th Floor 1735 Market Street Philadelphia, Pennsylvania 19103 Harvey Rosenfield The Foundation for Taxpayer and Consumer Rights 1750 Ocean Park Boulevard Suite 200 Santa Monica, California 90405, Eugene A. Spector Jeffrey L. Kodroff Andrew Abramowitz Spector & Roseman, P.C. 1818 Market Street Suite 2500 Philadelphia, Pennsylvania 19103
 
 
 2
 Attorneys for Appellees: Alan J. Davis (argued) Burt M. Rublin Raymond A. Quaglia Ballard Spahr Andrews & Ingersoll, LLP 1735 Market Street, 51st Floor Philadelphia, Pennsylvania 19103-7599
 
 
 3
 BEFORE: GREENBERG and WEIS, Circuit Judges, SCHWARTZ,* District Judge
 
 OPINION FOR THE COURT
 GREENBERG, Circuit Judge
 I. INTRODUCTION
 
 4
 This matter comes before this court on an appeal by Joseph Maio, Jo Ann Maio and Gary Bender (hereinafter "appellants") from the district court's final order entered September 29, 1999, which granted motions to dismiss appellants' complaint pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(6) and 9(b). In their "class action complaint," appellants asserted claims against Aetna, Inc., Aetna-U.S. Healthcare, Inc., and Aetna-U.S. Healthcare, Inc.'s 24 regional subsidiary health plans (collectively "Aetna" or "appellees") for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. S 1961 et seq., and state law. The appellants describe this case as challenging "Aetna's failure to disclose its restrictive and coercive internal policies and practices, which render its advertising, marketing and membership materials false and misleading in violation of RICO." Br. at 4. Appellants allege that "Aetna has engaged in a massive nationwide fraudulent advertising campaign designed to induce people to enroll in its HMO by representing that Aetna affirmatively manages its members' health care so as to, inter alia, raise the quality of care to a `level of health care never available under the old fee-for-service system,'" when in fact, Aetna designed undisclosed internal policies to "improve defendants' profitability at the expense of quality of care." Br. at 4-5 (footnote omitted). Appellants seek compensatory damages and an injunction enjoining appellees from pursuing the "policies, acts and practices" alleged in the complaint, together with punitive damages, treble damages, and attorney's fees under RICO.
 
 
 5
 Prior to filing an answer to the complaint, the appellees filed sequential motions to dismiss. In its Memorandum and Order of September 29, 1999, see Maio v. Aetna, Inc., No. 99-1969, 1999 WL 800315 (E.D. Pa. Sept. 29, 1999), the district court determined that appellants' RICO claims in counts I and II of the complaint failed because appellants did not allege that they suffered a concrete "injury in fact" sufficient to confer standing on them to challenge Aetna's allegedly fraudulent activities. Accordingly, the district court entered an order granting the appellees' motions insofar as they pertained to appellants' RICO claims, and thus dismissed with prejudice counts I and II of the complaint, the RICO counts. The district court then dismissed the state law claims without prejudice "for lack of subject matter jurisdiction." Id. at *2.
 
 
 6
 For the reasons that follow, we will affirm the district court's order dismissing the complaint on the ground that appellants have not alleged an injury to business or property cognizable under RICO.
 
 II. FACTS and PROCEEDINGS
 A. Factual Background
 
 7
 We decide this appeal on the facts appellants alleged in their complaint. Appellants instituted this purported class action on behalf of themselves and all members of a class consisting "of all persons in the United States who are, or were, enrolled in [Aetna's] Health Maintenance Organization (the `HMO') plans (the `Plan') at any time during the period from July 19, 1996 to the present (the `class period')."[1] JA-14. The class allegedly consists of millions of both present and former Aetna HMO members who, as a group, "were targeted by [Aetna] and induced into enrolling in Aetna's HMO by virtue of defendants' standardized and uniform misrepresentations and omissions of material facts contained in advertising, marketing and membership materials." Id. Appellants aver that during the class period, Aetna engaged in a fraudulent scheme designed to induce individuals to enroll in its HMO plan by representing "that its primary commitment, in connection with the healthcare services provided to its HMO members, is to maintain and improve the quality of care given to such members and that defendants' policies are designed to accomplish these goals." JA-14.
 
 
 8
 Appellants also assert that Aetna represented that HMO members would receive high quality health care from physicians who are solely responsible for providing all medical care and maintaining the physician-patient relationship, when in reality Aetna's internal policies restrict the physicians' ability to provide the high quality health care that appellants have been promised. JA-15. Moreover, they claim that despite Aetna's representations that it compensated its physicians under a system that provides them with incentives based upon the quality of care provided, Aetna's provider contracts actually offer the physicians financial incentives to withhold medical services and reduce the quality of care to HMO members. Id.
 
 
 9
 The complaint alleges that Aetna made these various representations through marketing, advertising and membership materials distributed to each and every prospective enrollee including the appellants. JA-29. The complaint provides several examples of Aetna's advertisements during the class period, each of which appellants claim reaffirmed in some manner Aetna's supposed commitment to "raising the quality of healthcare in America." See JA-29 to JA-34. Similarly, the complaint refers to certain membership materials, including a brochure entitled "HMO Plan Benefits," and avers that the brochure represented that Aetna provides financial incentives "intended to continually improve medical care," see JA-35, when in reality, the financial incentives were intended to have just the opposite effect--i.e., to restrict the level of health care that the participants received.
 
 
 10
 The complaint further points to the "HMO Plan Member Handbook" and the "Certificate of Coverage," and alleges that Aetna falsely represented therein that the health care administered under the HMO is entrusted solely to Aetna- affiliated physicians and individual practice associations. Appellants claim essentially that these representations created an illusion that the physicians would make the necessary decisions regarding patient care independently, when in reality Aetna's policies restricted the physicians' decisionmaking abilities concerning the level and extent of care to be provided in particular cases. Appellants argue specifically that the HMO Plan Member Handbook explicitly states that (1) "Participating Physicians maintain the physician-patient relationship with Members and are solely responsible to Member for all Medical Services which are rendered by Participating Physicians"; (2) "Understand that participating doctors and other health care providers who care for you are not employees of the HMO and that the HMO does not control them"; and (3) HMO members have the right to "[h]elp your doctor make decisions about your health care." See JA-35 (alteration in original); JA-321 to JA-322; Br. at 11.[2]
 
 
 11
 Appellants also claim that appellees falsely represented in other membership documents that physicians would be awarded for providing quality care, when in reality the physicians were rewarded under Aetna's plan based on how well they minimized costs. Appellants first point to the HMO Plan Member Handbook as well as the "Physician and Hospital Directory" and contend that appellees represented therein that in order to ensure that HMO members receive high quality care, physicians are compensated under a system that provides them with incentives based upon the quality of care provided:
 
 
 12
 Primary care physicians are generally compensated in accordance with our Quality Care Compensation System, which rewards primary care physicians for delivery of quality care in a cost-effective manner. This includes payment on a per member per month basis (capitation), as well as quality incentives to enhance patient satisfaction, improve medical care, and participate in continuing medical education programs. Also a small component of overall compensation reflects how effectively the physician manages the cost of the hospital and specialist services and provides effective preventative care.
 
 
 13
 JA-36 to JA-37 (alteration in original). Appellants also rely on representations made in appellees' brochure entitled "How We Measure Quality," in which appellees allegedly convey that physicians are compensated "based upon quality of care considerations." JA-36. Appellants rely on the following statements in the brochure:
 
 
 14
 Aetna-U.S. Healthcare has been recognized as the industry leader in using information about the quality of care and service provided to members to help determine how primary care physicians are paid. Our incentives are directed to reward better quality care and to guard against any potential to withhold care. This innovative payment method, the Quality Care Compensation System (QCCS) is in the process of being extended to Aetna-U.S. Healthcare participating physicians across the nation. QCCS rewards primary care physicians for delivering quality care in a cost-effective manner. This includes paying primary care physicians on a per member per month basis (capitation), as well as providing quality incentives to satisfy patients, improve medical care and participate in continuing medical education programs.
 
 
 15
 In particular, QCCS can positively influence care by rewarding primary care physicians whose charts reflect their attention to quality preventative medicine. This includes taking a thorough medical history of the patient, providing immunizations and cholesterol testing, and properly recording the physician's findings. Member survey results are also considered because we value the opinions expressed by our members about the quality of care and service they receive from their primary care physicians. Also a small portion of the total compensation reflects how effectively the physician manages the cost of hospital and specialist services and provides effective preventative care.
 
 
 16
 JA-36 to JA-37. Appellants further point out that the brochure concludes by stating:
 
 
 17
 This brief introduction to the Quality Improvement Program at Aetna-U.S. Healthcare demonstrates why we believe no other managed care organization embraces quality as intensively as we do. We are accumulating extensive information on the care received by our 10.8 million managed care members. Our commitment to quality improvement enables us to deliver health care plans that are readily distinguished from the rest of this industry.
 
 
 18
 JA-37.
 
 
 19
 According to appellants' complaint, despite the representations appellees made in their advertising, marketing and membership materials, they failed to disclose certain of their internal policies which contradict the message conveyed to appellants that quality care was Aetna's primary concern. JA-38. Aetna's allegedly undisclosed internal policies include: (1) generating agreements with medical service providers which restrict the ability of Aetna's physicians to provide quality care; (2) providing financial incentives to physicians which are intended to reduce the quality of care provided to plan members rather than raise the quality of care; and (3) providing disparate treatment to HMO members who receive benefits under a plan subject to the Employee Retirement Income Security Act ("ERISA") versus non- ERISA HMO members. JA-38.
 
 
 20
 The class action complaint provides the following examples of Aetna's "systemic policies" with respect to the provider agreements between Aetna and the participating physicians which allegedly inhibit the physicians' abilities to provide quality care to Aetna's HMO members:
 
 
 21
 * Aetna's policy of `removing the medical decision- making process from the plan members' physicians and giving it to Aetna-USHC, despite the fact that defendants represent in the marketing and advertising material they distribute to prospective enrollees that physicians are solely responsible for all medical services provided.'
 
 
 22
 * Aetna's decision to define the term `medical necessity' `in an extremely narrow fashion that focuses minimally on clinical medicine and focuses largely on cost and convenience to the plan.'
 
 
 23
 * Aetna's policy which permits it `to override a physician's decisions about what care is medically necessary' and its failure `to provide a mechanism for physicians to appeal a decision by Aetna that patient care is not deemed medically necessary-- even though defendants represent in their marketing material that physicians cannot be penalized for filing a complaint or an appeal.'
 
 
 24
 * Aetna's policy of including `gag' clauses in provider contracts that allegedly limit physicians' ability to disclose information to patients.
 
 
 25
 * Aetna's policy of `refusing to negotiate with individual physicians contract provisions that [allegedly] implicate serious concerns regarding patient care.'
 
 
 26
 * Aetna's decision to retain `the power to amend, unilaterally, all terms of their contract, including clinical protocols and procedures, without any requirement that Aetna notify physicians.'
 
 
 27
 * Aetna's policy of purportedly restricting patient access to emergency care services.
 
 
 28
 * Aetna's policy of providing an `open-ended definition of emergency care which [allegedly] fails to incorporate a prudent layperson standard or in any way make clear what kind of treatment options a patient will receive under the plan when they reasonably seek emergency services.'
 
 
 29
 * Aetna's policy which gives the Plan co-ownership of patient medical records which violates, according to plaintiffs, physician-patient confidentiality.
 
 
 30
 JA-39 to JA-40. Appellants claim that Aetna "fail[ed] to disclose the existence of these restrictive agreements with physicians, despite the fact that [Aetna] represent[ed] in their marketing materials that plan members have the right to know how Aetna-USHC decides what services are covered." JA-39.
 
 
 31
 Appellants also describe in their complaint the nature of Aetna's purportedly undisclosed financial incentives provided to physicians which allegedly were designed to reduce the quality of care provided to its HMO members:
 
 
 32
 * `incentives and disincentives which seek to reward physicians for achieving large patient/member ratios. For example, physicians are rewarded for a patient/member ratio which exceeds 750 patients per provider.'
 
 
 33
 * `incentives and disincentives which seek to restrict HMO members' hospitalization, specialist and emergency room utilization.'
 
 
 34
 * `quality factored distributions which reward physicians for attaining specific performance utilization targets for acute hospitalization care, catastrophic specialist utilization and emergency room utilization.'
 
 
 35
 JA-40 (internal quotation marks omitted).
 
 
 36
 Appellants also challenge Aetna's failure to disclose its policy of "disparately treating individuals who receive their benefits through ERISA plans (where liability may be limited to statutory remedies) versus those who receive their benefits through non-ERISA plans (where liability may be much greater)." Br. at 16; see also JA-50. The complaint alleges that an internal Aetna videotape concerning its disability insurance claims handling practice records Aetna representatives' directions to its employees to "do more on a non-ERISA plan to protect against the potential for exposure to litigation, thereby discriminating against ERISA beneficiaries." JA-50 to JA-51 (internal quotation marks omitted). The complaint further avers that "[a]lthough the training video dealt with the handling of long-term disability claims, an Associated Press article dated October 12, 1998, . . . stated that while the topic of the video was long-term disability claims and not health insurance, `the company says that its policies do not differ.' " JA-53 to JA- 54. Appellants state that "[s]uch a policy also evidences [Aetna's] intention to provide only the most minimal, not quality healthcare services to all its HMO members." JA-54.
 
 
 37
 Count I of appellants' complaint alleges that Aetna's conduct violated RICO sections 1962(c) and (d), and count II states a claim predicated on RICO sections 1962(a) and (d).[3] Counts III through V assert claims arising under Pennsylvania law (Count III--Fraud and Deceit; Count IV-- Pennsylvania Unfair Trade Practices and Consumer Protection Law--"and Other Similar Consumer Protection Statutes"; Count V--Unjust Enrichment).
 
 
 38
 Section IV of the complaint, which is entitled "Appropriateness of Class Treatment," not only provides a summary of the legal theory upon which appellants predicate their federal and state claims, but also states explicitly those theories upon which appellants' claims are not based:
 
 
 39
 In addition, this action does not seek to remedy claims of personal injury, contract, denial of benefits, medical malpractice and/or wrongful death against defendants. Moreover, this action seeks to remedy claims addressing the quality of healthcare services as set forth in Dukes v. U.S. Healthcare, Inc., 57 F.3d 350 (3d Cir. 1995), and its progeny, and does not seek to recover benefits due under the terms of a plan, to enforce rights under the terms of a plan or to clarify rights to future benefits under the plan.
 
 
 40
 JA-25.
 
 
 41
 In accordance with their stated intention to challenge only the quality of health care services that Aetna arranged for and provided through its participating physicians, appellants allege that as a result of Aetna's adoption of the systemic polices and practices outlined in the complaint, "the healthcare provided to plaintiffs and the Class is not as represented in their uniform marketing, advertising and membership materials." According to appellants, "the substantial difference in the quality of healthcare services marketed by defendants, and the quality of healthcare services actually provided to plaintiffs and the Class, cause membership in the Plan to be worth much less than that actually charged by defendants, and have ultimately resulted in damages to plaintiffs and the Class." JA-54. They also explain that "[p]laintiffs and the members of the Class enrolled in Aetna's HMO Plans paid periodic premiums to defendants as a result of defendants' fraudulent practices" and therefore have "been injured in their business and/or property by defendants' racketeering activity in amounts to be determined at trial." JA-58.
 
 B. Procedural History
 
 42
 Appellants filed their complaint in the district court on April 19, 1999. JA-1. As we previously mentioned, the appellees filed sequential motions to dismiss pursuant to Fed. R. Civ. P. (hereinafter "Rule") 12(b)(1), 12(b)(6) and 9(b), arguing that appellants' complaint was subject to dismissal for several reasons. As described by the district court, Aetna first argued that appellants lacked standing to sue under RICO. It argued that, while appellants claim that because of its actions the quality of care "will suffer and/or their HMO plans are worth less than they cost, no one claims to have been injured by being denied necessary care." Maio, 1999 WL 800315, at *1. In other words, as we interpret the appellees' argument, they claimed that appellants failed to allege facts which demonstrate that appellants suffered a cognizable injury "to business or property," which is a necessary element of a civil RICO claim.
 
 
 43
 Second, Aetna claimed that any injury appellants might have suffered as a consequence of the fraud was indirect at best and that the complaint therefore failed to allege sufficient factual information supporting the inference that appellants' injuries were proximately caused by appellees' allegedly fraudulent conduct. Third, appellees asserted that appellants' RICO counts failed to state a claim because the appellees' allegedly fraudulent statements about "quality of care" which constituted the basis for appellants' allegations of racketeering activity, were nothing more than "mere puffery" and therefore were not actionable. In any event, the appellees claimed that they did not commit any fraud against the appellants because the policies and contract information that they allegedly concealed from the appellants in fact were disclosed fully to the public. Fourth, appellees contended that appellants failed to plead a valid RICO enterprise (for purposes of count I under section 1962(c)), and also failed to allege any injury resulting from the investment or use of alleged racketeering income (for purposes of count II under section 1962(a)). Finally, appellees argued that appellants' RICO claims were preempted by ERISA, the Federal Employee Health Benefits Act ("FEHBA"), and the Medicare Act, and alternatively were precluded by the application of the McCarran-Ferguson Act. See id. Appellants responded to appellees' arguments, and specifically requested in their opposition brief the opportunity to amend the complaint to cure any pleading deficiencies that the district court might find.
 
 
 44
 As previously mentioned, the district court dismissed appellants' RICO claims (pleaded in counts I and II) on the merits and declined to exercise supplemental jurisdiction over their state law claims (pleaded in counts III-V).[4] The primary basis for the district court's dismissal of the RICO claims was what it perceived to be appellants' lack of a concrete "injury-in-fact" sufficient to confer standing upon them.[5] After citing the constitutional standing requirements the Supreme Court articulated in Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136 (1992), the district court reasoned that the allegations in appellants' complaint belied their assertion that they suffered any concrete economic injury stemming from appellees' allegedly fraudulent conduct:
 
 
 45
 Plaintiffs claim to have been injured in that they were fraudulently induced to enroll in the HMOs as a result of Aetna's representation that it is primarily concerned with quality of care. Because defendants are allegedly more interested in profits and cost containment, plaintiffs contend that they have paid more for their HMO plans than those plans are worth. As noted above, however, plaintiffs disclaim any injury due to the denial of benefits, reduction of benefits, inferior care, malpractice, negligence or breach of contract--in short, plaintiffs have disclaimed any injury that has the potential to decrease the value of defendants' plans. The HMOs simply cannot be `worth less' unless something plaintiffs were promised was denied them. A vague allegation that `quality of care' may suffer in the future is too hypothetical an injury to confer standing upon plaintiffs, and in addition, would require this court to assume that in every case, individual physicians and [individual practice associations] will be moved to put their own economic interests ahead of their patients' welfare. Even if this were the inevitable result, defendants would not be the proximate cause of the providers' ethical lapses. See Weiss v. CIGNA Healthcare, Inc., 972 F. Supp. 748, 752 (S.D.N.Y. 1996).
 
 
 46
 Maio, 1999 WL 800315, at *2.
 
 
 47
 While the court noted that it did not have to address the remainder of Aetna's arguments in support of dismissal, it nevertheless held in the alternative that appellants' complaint failed to plead a valid RICO enterprise, and also that it was "highly doubtful that advertising one's commitment to `quality of care' can serve as the predicate for a fraud claim." Id. The court concluded its discussion of appellants' RICO claim by observing that "plaintiffs' expression of dissatisfaction with defendants' plans--indeed with HMOs in general--is more appropriately directed to the legislatures and regulatory bodies of the several states." Id. Ultimately, the court entered an order dismissing appellants' RICO claims with prejudice, without specifically addressing their request for leave to amend the complaint.[6] Appellants filed a timely notice of appeal on October 26, 1999.
 
 III. JURISDICTION and STANDARD OF REVIEW
 
 48
 The district court exercised jurisdiction over appellants' RICO claims pursuant to 28 U.S.C. S 1331, and over the supplemental state law claims under 28 U.S.C. S 1367. We have appellate jurisdiction under 28 U.S.C. S 1291 to review the district court's final order of September 29, 1999.
 
 
 49
 In reviewing a district court's dismissal of a complaint pursuant to Rule 12(b)(6) for failure to state a claim upon which relief may be granted, our review is plenary and we apply the same test as the district court.[7] "A motion to dismiss pursuant to Rule 12(b)(6) may be granted only if, accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief." In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1420 (3d Cir. 1997) (citing Bartholomew v. Fischl, 782 F.2d 1148, 1152 (3d Cir. 1986)). " `The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.' " Id. (quoting Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686 (1974)). Also we exercise plenary review over the district court's legal determination that appellants lacked standing to pursue a civil action against Aetna under section 1964(c) of RICO. See Stehny v. Perry, 101 F.3d 925, 929 (3d Cir. 1996) (stating that standard of review for dismissal on standing grounds is plenary).
 
 IV. DISCUSSION
 
 50
 While appellees argue that we may affirm the district court's order dismissing the class action complaint on a variety of grounds, we need address only one issue--that is, whether appellants have alleged a valid RICO injury to business or property sufficient to afford them standing under RICO to challenge Aetna's purportedly fraudulent scheme. See Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496, 105 S.Ct. 3275, 3285 (1985) (noting that a plaintiff "only has standing [under RICO] if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation."); DeMauro v. DeMauro, 115 F.3d 94, 96 (1st Cir. 1997) (noting that threshold question of whether plaintiff made out a claim of "injury" to her "business or property" has been described as "a standing issue"); see also Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., 140 F.3d 494, 520- 21 (3d Cir. 1998) (stating that section 1964(c) sets forth the "standing requirement" applicable to suits brought under RICO). We reach this conclusion because, while we do not agree entirely with the district court's analysis on this point, we believe that the court's ultimate determination was correct in light of the facts pleaded in the complaint, the legal theory on which appellants' claim of financial loss is predicated, and the reasoning of the Supreme Court's recent decision in Pegram v. Herdrich, 120 S.Ct. 2143 (2000).
 
 
 51
 Apart from the Article III constitutional and prudential standing requirements which we have addressed repeatedly in various contexts, see, e.g., The Pitt News v. Fisher, 215 F.3d 354, 360-62 (3d Cir. 2000) (citing Lujan , 504 U.S. at 560, 112 S.Ct. at 2136), Society Hill Towers Owners' Ass'n v. Rendell, 210 F.3d 168, 175-78 (3d Cir. 2000) (same), plaintiffs seeking recovery under RICO must satisfy additional standing criterion set forth in section 1964(c) of the statute. See DeMauro, 115 F.3d at 96 ("There is plainly a case or controversy under Article III; but the statutory precondition of injury to business or property must also be met."). In the RICO setting, standing is conferred upon "any person injured in his business or property by reason of a violation of section 1962 of this chapter. . . ." 18 U.S.C. S 1964(c).[8] Extrapolating from this language, we read section 1964(c) as requiring a RICO plaintiff to make two related but analytically distinct threshold showings relevant in this appeal: (1) that the plaintiff suffered an injury to business or property; and (2) that the plaintiff 's injury was proximately caused by the defendant's violation of 18 U.S.C. S 1962.[9] See First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 767 (2d Cir. 1994); see Brokerage Concepts, 140 F.3d at 520-21 (addressing section 1964(c)'s proximate cause requirement in the context of standing analysis).
 
 
 52
 The Supreme Court has stated that "the plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation [of RICO]." Sedima, S.P.R.L., 473 U.S. at 496, 105 S.Ct. at 3285. "As the Seventh Circuit has stated, `[a] defendant who violates section 1962 is not liable for treble damages to everyone he might have injured by other conduct, nor is the defendant liable to those who have not been injured.' " Id. at 496-97, 105 S.Ct. at 3285 (quoting Haroco, Inc. v. American Nat'l Bank & Trust Co., 747 F.2d 384, 398 (7th Cir. 1984), aff'd, 473 U.S. 606, 105 S.Ct. 3291 (1985), which rejected a "racketeering injury" requirement under section 1964(c) of RICO). While the Supreme Court has stated generally that "RICO is to be read broadly," see id. at 497, 105 S.Ct. at 3285, the Court of Appeals for the Ninth Circuit has observed that section 1964(c)'s limitation of RICO standing to persons "injured in [their] business or property" has a "restrictive significance, Reiter v. Sonotone Corp., 442 U.S. 330, 339, 99 S.Ct. 2326, 2331 . . . (1979), which helps to assure that RICO is not expanded to provide a federal cause of action and treble damages to every tort plaintiff." Steele v. Hospital Corp. of Am., 36 F.3d 69, 70 (9th Cir. 1994) (internal quotation marks omitted). Thus, "a showing of injury requires proof of a concrete financial loss and not mere injury to a valuable intangible property interest." Id. (internal quotation marks omitted).
 
 
 53
 As appellants recognize, see br. at 22-23, the injury to business or property element of section 1964(c) can be satisfied by allegations and proof of actual monetary loss, i.e., an out-of-pocket loss. See Steele, 36 F.3d at 70 (stating that plaintiffs have not suffered a financial loss under RICO if they have paid none of the allegedly excessive charges out of their own pockets); Oscar v. University Students Co- Operative Ass'n, 965 F.2d 783, 785 (9th Cir. 1992) (en banc) (injuries to property are not actionable under RICO unless they result in tangible financial loss to plaintiff); Berg v. First State Ins. Co., 915 F.2d 460, 464 (9th Cir. 1990) (holding that plaintiffs suffered no damages under RICO because it was undisputed that they did not incur any out-of-pocket expenses as a result of defendants' conduct); see also Dornberger v. Metropolitan Life Ins. Co., 961 F. Supp. 506, 521 (S.D.N.Y. 1997) (stating that section 1964(c) "requires a showing of some actual, out-of-pocket financial loss"); cf. Reiter, 442 U.S. at 340, 99 S.Ct. at 2331-32 (interpreting "injury to business or property" element of Section 4 of the Clayton Act, 15 U.S.C. S 15, and stating that consumers who have been "deprived of only money, albeit a modest amount," have sustained a "property" injury); Rosario v. Livaditis , 963 F.2d 1013, 1021 (7th Cir. 1992) (where class of beauty school students sued beauty schools and the owner under RICO for defendants' alleged fraud in inducing plaintiffs to enroll in beauty school which provided poor quality instruction, substandard equipment and facilities, court stated that plaintiffs' RICO injury was manifested by their governmental student loans for which they remained obligated to repay). Throughout this opinion, we will refer to this showing as the "damage element" or the "financial loss" requirement of appellants' RICO cause of action. See Oscar, 965 F.2d at 785 n.1 (stating that "actual injury" means "financial loss"); Berg, 915 F.2d at 464 (noting that "[a]bsent damages, a RICO claim cannot be sustained").
 
 
 54
 Stated in its most general form, appellants' argument with respect to the damage element of their RICO claims is that they have standing under RICO because they paid too much in their premium dollars for the health insurance they received from Aetna.[10] While we will describe the specific contours of appellants' "overpayment" argument in greater detail in our discussion that follows, in a nutshell, they claim that their financial loss is demonstrated by reference to a rather straightforward damages concept, which, they claim, applies squarely to the facts of this case. In the interest of clarity, we will refer to appellants' argument in this regard as their "RICO injury theory." Specifically, they claim that each member of the nationwide class paid too much in premiums for an "inferior" health care product, i.e., the inferior health insurance they received from Aetna through its HMO plan.[11]
 
 
 55
 The question presented in this appeal therefore is whether the facts as pleaded in the complaint are sufficient to support appellants' assertion that they have suffered a present injury to property, which, according to them, takes the form of a financial loss stemming from their overpayment for their membership in Aetna's HMO plan. To resolve this issue, we must examine the allegations in the complaint and any reasonable inferences that may be drawn from those allegations, and consider their legal significance in view of appellants' injury theory proffered in support of the damage element of their RICO claim.[12]
 
 
 56
 As previously mentioned, the district court dismissed appellants' RICO claims because it determined that their complaint failed to plead sufficient facts to support their assertion that they paid too much for the health insurance they received through Aetna's HMO plan. The court pointed out specifically that appellants' complaint did not allege that they suffered personal injuries, were denied necessary benefits, or received inferior care. It further relied on that portion of the complaint which stated that "this action does not seek to remedy claims of personal injury, contract, denial of benefits, medical malpractice and/or wrongful death against defendants." JA-25. The court believed that inasmuch as the complaint essentially admitted that appellants suffered no adverse medical consequences which have the potential to decrease the value of their health insurance and to cause them to have paid too much in premium dollars, appellants' health insurance logically could not be "worth less" than what they paid for it.
 
 
 57
 On appeal, appellees continue to press the argument that appellants cannot demonstrate a RICO injury to property in the context of this case absent specific allegations that they have suffered medical injuries, a denial of necessary benefits, reduction of benefits, or inferior care from participating physicians as a result of the allegedly improper policies and practices challenged in the complaint. They state that "plaintiffs do not claim, and in fact, have expressly disclaimed, any injury due to the denial of benefits, reduction of benefits, inferior care, malpractice, negligence and breach of contract." Br. at 14. Appellees characterize appellants' allegations of injury in the following manner: "Essentially, plaintiffs contend that the mere possibility that a physician might be influenced by defendants' alleged `incentives' to withhold necessary medical care from, or provide inadequate treatment to, plaintiffs if plaintiffs were to develop a covered medical condition that required treatment in the form of a covered medical service is sufficient, in and of itself, to cause a concrete and measurable diminution in the value of plaintiffs' HMO memberships from inception." Id. They claim that this theory of injury is fundamentally flawed -- "as a matter of law and of common sense" -- because the value of appellants' HMO memberships cannot be diminished unless and until appellees' alleged undisclosed policies actually cause a denial of medical care or some other benefit to which appellants are entitled. Id.
 
 
 58
 According to appellants, despite the fact that the complaint explains their claims as challenging the "quality of health care services" Aetna provided to its HMO members, JA-25, they need not allege any specific instances in which appellants were denied medically necessary care, received inferior care, delayed treatment or suffered medical injuries as a consequence of Aetna's implementation of the policies and practices outlined in the complaint in order to demonstrate that each member of the nationwide class suffered a concrete financial injury at the point at which they enrolled in Aetna's HMO plan. As we previously mentioned, we understand appellants' RICO injury theory as premised on a damages concept which they claim supports their bare allegation that they suffered an injury to property sufficient to confer standing under RICO.
 
 
 59
 In particular, appellants rely on the legal principle that a consumer suffers tangible economic injury where the circumstances demonstrate that the consumer paid too much for an "inferior" product. See br. at 27 ("Where, as here, plaintiffs have alleged that they have been economically injured by defendants' racketeering activity, because they have paid too much for the product purchased, they have standing under RICO."). Appellants apply this principle to the facts in this case by arguing that the very existence of the policies and practices outlined in the complaint demonstrates that appellants have been damaged, i.e., suffered a concrete financial loss, in the sense that the health insurance they received from Aetna is "inferior" to, and less valuable than, the insurance that Aetna promised to provide to its prospective enrollees. Appellants thus posit that because the policies and practices outlined in the complaint render their health insurance "inferior" in comparison to that which Aetna promised to them through its marketing, advertising and membership materials, they have suffered present economic harm in the form of overpayment for an "inferior health care product." Br. at 27-28.
 
 
 60
 Put differently, according to appellants' theory, the difference in value between the health insurance promised and the health insurance actually received, and consequently their RICO injury to property, is demonstrated by reference to the intrinsic value of health insurance with policies geared towards providing quality health care services, as compared to inferior health insurance with policies driven primarily by fiscal and administrative concerns. While not stated explicitly, the existence of appellants' financial loss under this theory necessarily is predicated on the assumption that Aetna's policies, in and of themselves, are of such a nature so as to have a direct negative impact on the economic value of appellants' health insurance, causing them to have overpaid for what they actually received. See JA-54 ("The healthcare provided to plaintiffs and the Class is not as represented by defendants . . . . As such, the substantial differences in the quality of healthcare services marketed by defendants, and the quality of healthcare services actually provided to plaintiffs and the Class, cause membership in the Plan to be worth much less than that actually charged by defendants[in terms of premium payments]."); see also br. at 23 ("As a result of Aetna's undisclosed systemic policies and fraudulent marketing scheme described above, Aetna's HMO members have received a health care product the intrinsic worth of which is not commensurate with the assurances made and the price charged by defendants."); Tr. of Oral Arg. at 31 (noting that the HMO product is of lesser value because Aetna's practices "give you less").
 
 
 61
 According to appellants, their financial loss occasioned as a result of their purchase of an "inferior health care product" is their present RICO injury which is not dependent upon individualized proof concerning the level or adequacy of the care that each appellant received under Aetna's HMO plan. While they point out that their complaint states in general terms that the appellees' conduct demonstrates that "benefits were reduced," they claim nevertheless that in any event, their position is that "what the doctor does or does not do is irrelevant."[13] Tr. of Oral Arg. at 14.
 
 
 62
 For the reasons that follow, we reject appellants' theory that their complaint states valid RICO claims based on the financial losses they purportedly sustained by enrolling in Aetna's "inferior" HMO plan in the absence of allegations to the effect that each appellant suffered negative medical consequences resulting from Aetna's enactment of the policies and practices at issue. Stated another way, in the context of this case, we hold that appellants cannot establish that they suffered a tangible economic harm compensable under RICO unless they allege that health care they received under Aetna's plan actually was compromised or diminished as a result of Aetna's management decisions challenged in the complaint. It seems clear to us that unless appellants claim that Aetna failed to provide sufficient health insurance coverage to the members of their HMO plan in the sense that such individuals were denied medically necessary benefits, received inadequate, inferior or delayed medical treatment, or even worse, suffered personal injuries as a result of Aetna's systemic policies and practices, there is no factual basis for appellants' conclusory allegation that they have been injured in their "property" because the health insurance they actually received was inferior and therefore "worth less" than what they paid for it. Of course, such losses would have to be alleged and proven on an individual basis. Inasmuch as we hold that appellants have not alleged facts sufficient to establish the fact of damage, i.e., appellants' injury to property stemming from their purchase of an "inferior" product, they have no cause of action under RICO.
 
 A.
 
 63
 As previously mentioned, at the heart of this appeal is appellants' contention that the injury element of their RICO claims is satisfied in this case by virtue of the difference between the "health care product" Aetna represented it would provide and that which it actually delivered, and the monetary loss that followed as a consequence thereof. Based upon their basic description of their purported economic harm, we have pinpointed the precise "injury to property" that appellants claim to have suffered in this case. Importantly, while not explicitly articulated as such, we believe that the property injury claimed in this case is comprised of two interrelated economic harms flowing from appellants' purchase of an allegedly inferior health care product. First, appellants maintain that they have been injured in their property in the sense that their tangible property, i.e., Aetna's "health care product," has a diminished economic value because of Aetna's managerial policies. Proceeding from the premise that the value of their health care product is less than they believed it to be as a result of Aetna's policies, a second aspect of this theory of RICO injury is that as a consequence of the diminution in value caused by Aetna's conduct, appellants are paying monthly premiums that are too high given what they actually are receiving, i.e., an "inferior health care product." See br. at 23 (noting that Aetna's members received a health care product whose "intrinsic worth" is not "commensurate with the assurances made and price charged.").
 
 
 64
 Based on our interpretation of the economic harm alleged, there is a fundamental problem with appellants' injury theory which is fatal to their RICO claims. According to appellants, the fact of injury is demonstrated by the decrease in the economic value of their property, i.e., their health insurance, which occurred as a result of Aetna's implementation of its managerial policies and practices, but the damages concept of a "diminution in property value" does not have a proper application to this case. While appellants describe Aetna's health insurance as an "HMO product," and claim "injury" to this piece of property by virtue of Aetna's restrictive and coercive internal policies and practices which allegedly reduce its "intrinsic" value, this characterization ignores the nature of the property interest at issue--that which is conveyed through membership in Aetna's HMO.
 
 
 65
 Notwithstanding appellants' description of the property interests they acquired through their enrollment in Aetna's HMO plan, Aetna's HMO is not a tangible property interest, like a plot of land or a diamond necklace, as appellants' argument necessarily implies. See br. at 30-31 (analogizing appellants' claimed injury in this case to plaintiffs' injury asserted in Thompson v. Paasche, 950 F.2d 306 (6th Cir. 1991), reply br. at 4-6 (relying on analogy posited in FTC v. Figgie Int'l, Inc., 994 F.2d 595 (9th Cir. 1993)). In the context of a case in which the property interest at stake is of a tangible nature, it seems logical that an injury to that property, and consequently the fact of damage under RICO, may be demonstrated by reference to external conditions or the occurrence of events which cause the value of the real or personal property to be reduced. See Genty v. Resolution Trust Corp., 937 F.2d 899, 918 (3d Cir. 1991) (district court permitted plaintiffs to recover damages under RICO for economic harm occasioned by the loss of the market value of their homes as a consequence of defendants' fraud in connection with their sale of real property near toxic waste landfill); Northeast Women's Ctr., Inc. v. McMonagle, 868 F.2d 1342, 1349 (3d Cir. 1989) (finding that plaintiff satisfied economic injury element of RICO where it established that defendants entered plaintiff 's premises and destroyed and damaged certain of its medical equipment); see also Oscar, 965 F.2d at 790-91 (Kleinfeld, J., dissenting) (opining that injury to property element of RICO can be satisfied by tenant's claim that defendants' tortious conduct caused injuries to her possessory interest in leasehold, even if the injury caused no out-of-pocket loss to the tenant; dissent argued vigorously that property damage would be incurred and measured by virtue of the reduction in the value of the tenant's property interest); Thompson, 950 F.2d at 313 (finding that the fact of damage was demonstrated by the existence of the mineral lease on plaintiffs' property, which plaintiffs claimed that defendant procured through fraud; the damage stemmed from the fact that the lease itself reduced the market value of the property).
 
 
 66
 Here, however, the property at issue is not real or personal property; rather, it is a contract for health insurance.[14] Thus, the nature of appellants' property interests at stake is their contractual right to receive benefits in the form of covered medical services. See Pegram, 120 S.Ct. at 2149 ("The defining feature of an HMO is receipt of a fixed fee for each patient enrolled under the terms of a contract to provide specified health care if needed."); Dukes v. U.S. Healthcare, Inc., 57 F.3d 350, 358 (3d Cir. 1995) (noting that benefit contracted for by enrollees in HMO plan is health care services); see also Oscar, 965 F.2d at 789-90 (Kleinfeld, J., dissenting) (discussing the nature of the property rights at issue in Berg v. First State Ins., 915 F.2d 460, and observing that plaintiffs' property interests in their liability insurance policies were in the nature of a contract right). When viewed from this correct perspective, the economic harm to appellants' actual property interests cannot be characterized in terms of a "diminution in product value," because the property rights at issue are different from interests in real or personal property. See Oscar, 965 F.2d at 789-90 (Kleinfeld, J., dissenting) (explaining that the kind of property interest at stake determines the type of economic injury realized; where property at issue is in the nature of real or personal property, a reduction in property value is the harm suffered, but where property interest is in the nature of a contract right, financial losses occasioned by defendant's breach constitute the economic harm suffered). And inasmuch as an economic injury to appellants' "property" could not stem from a reduction in its value given the nature of the property interests at stake, appellants' protestations notwithstanding, the fact that Aetna implemented allegedly "restrictive and coercive" internal policies cannot be considered the determinative factor that caused appellants to suffer an economic loss compensable under RICO.
 
 
 67
 Thus, the issue that we must resolve is how appellants could establish the fact of damage in this context, i.e., what set of factual circumstances must they plead and prove to establish a compensable "injury" to their contractual rights under Aetna's HMO plan, thus causing them consequential monetary loss. In other words, what is the external event or condition which would cause appellants to have suffered economic harm, and have appellants alleged facts demonstrating that the necessary injury-causing event has occurred?
 
 
 68
 Because appellants' property interests in their memberships in Aetna's HMO plan take the form of contractual rights to receive a certain level (quantity and quality) of benefits from Aetna through its participating providers, see Pegram, 120 S.Ct. at 2149, it inexorably follows that appellants cannot establish a RICO injury to those property rights (which in turn would cause financial loss in the form of overpayment for inferior health insurance) absent proof that Aetna failed to perform under the parties' contractual arrangement. See Oscar, 965 F.2d at 789 (Kleinfeld, J., dissenting) (discussing Berg and noting that the "nature of the property [in Berg] was a contract right. The only damages from injury to that property would be on account of loss performance on the contract."); Dornberger, 961 F. Supp. at 521-22 (where plaintiff paid premiums for life insurance contract and claimed that she suffered an injury to property stemming from misrepresentations concerning the legality of the life insurance contract, availability of guarantee fund protection and accessability of local service representatives, court found that plaintiff was required to allege facts which supported an out-of-pocket loss; court stated that plaintiff did not suffer RICO injury equivalent to full amount of premiums paid because insurer continued to honor insurance policies and therefore had not "failed to perform" in the sense that it failed to pay out on the policies).
 
 
 69
 In this factual setting, Aetna's failure to perform (and concomitantly appellants' injury to their property) would be evidenced by appellants' receipt of inadequate, inferior or delayed care, personal injuries resulting therefrom, or Aetna's denial of benefits due under the insurance arrangement. Absent allegations of such losses, which appellants specifically indicate are not involved in this case, they cannot establish that they have suffered an injury to their property rights encompassed in their HMO memberships--i.e., their right to receive necessary medical services covered under their plan, and cannot prove a consequential financial loss flowing from their property. See, e.g., Dornberger, 961 F. Supp. at 521 ("Case law does indicate that a plaintiff who is fraudulently induced to enter into a transaction does not suffer injury within the meaning of S 1964(c) until the defendant fails to perform--that is, until it becomes clear that the plaintiff will not get the benefit of the bargain.").
 
 
 70
 Apparently recognizing that the property interests at stake are in the nature of contractual rights to health care benefits rather than tangible property rights from which injury is demonstrated by events causing a diminution in value, appellants make a secondary argument that they have pleaded injury in this case by referring to Aetna's failure to implement policies and practices in accordance with its commitment to its members to "raise the quality of health care." See br. at 26, 33. Analogizing to the district court's analysis in Dornberger, see 961 F. Supp. at 522, see reply br. at 8, appellants claim to have suffered economic harm, i.e., lost money, by virtue of Aetna's breach of its specific promise to implement policies and practices which supposedly permitted physicians to provide Aetna's HMO enrollees with quality health care.
 
 
 71
 Invoking the legal principle that payment for services not rendered can constitute a valid injury to property under RICO, see id. at 523, appellants claim that they suffered that exact loss here--they paid a specific part of their premium dollars for the benefit of Aetna's promises to implement policies designed to foster quality health care and have been injured in their property by Aetna's "failure to perform as promised." Because the "services not rendered" aspect of their injury argument only refers to Aetna's purported promise to implement policies and practices geared towards quality health care, appellants contend that "what the doctors do or don't do is irrelevant." Tr. of Oral Arg. at 14; see also br. at 25-26 ("Plaintiffs do allege . . . that they were denied something Aetna promised it would provide its members as an inducement for, and in consideration of, the members' enrollment. . . .[P]laintiffs and other Class members paid premiums and copayments, not just to receive treatment from physicians, but also to obtain the benefit of Aetna's services in arranging and providing increased quality of care.").
 
 
 72
 We need not tarry on this argument, as it is premised on an erroneous characterization of Aetna's responsibilities to its enrollees as defined by the parties' contractual arrangement and Aetna's alleged extra-contractual promises to deliver "quality health care." Notwithstanding appellants' creative description of Aetna's obligations to its HMO members, as we have explained they undoubtedly sought from Aetna, and Aetna promised to provide its members, with a different contractual benefit--namely the right to receive covered health care benefits in the form of medically necessary supplies, health care services and treatment through Aetna's participating providers. See Pegram, 120 S.Ct. at 2149. Indeed, our review of the relevant contractual provisions and purported extra- contractual promises confirms our understanding of Aetna's obligations to its HMO members as their health insurer. See, e.g., JA-200, JA-208 (Certificate of Coverage, Introduction and "Covered Benefits" sections) (stating that "HMO agrees with contract holder to provide coverage for benefits" and that covered benefits, i.e. , various services and supplies described therein, are those which are deemed "medically necessary" by HMO); JA-209 to JA-219 (detailing members' specific covered benefits in parts A-R of Certificate of Coverage, including, inter alia , "Primary Care Physician Benefits," "Diagnostic Services," "Maternity Care," "Inpatient Hospital and Skilled Nursing Facility Benefits," "Emergency Care/Urgent Care Benefits," "Durable Medical Equipment Benefits," "Injectable Medications"); see also, e.g., JA-29 to JA-30 (stating that Aetna represented that "its primary commitment, in connection with the health care services provided to its HMO members, is to maintain and improve the quality of care given to such members"); JA-30 ("We're committed to Raising the Quality of Healthcare in America."); id. (Raising the quality of healthcare is our goal.").
 
 
 73
 Accordingly, regardless of appellants' description of Aetna's obligations to its HMO enrollees, contractual or otherwise, it is obvious that Aetna's primary commitment to its HMO plan members is to provide quality health care services through its participating provider network. Concomitantly, appellants' contractual benefit is their receipt of quality medical services from those sources. We reach this conclusion because the provision and receipt of covered medical care is at the heart of the parties' contractual arrangement and is the driving force behind the purchase of health care insurance. See In re U.S. Healthcare, Inc., 193 F.3d 151, 162 (3d Cir. 1999) ("[W]hen the HMO acts under the ERISA plan as a health care provider it arranges and provides medical treatment directly or through its hospitals, doctors or nurses."), cert. denied, 120 S.Ct. 2687 (2000); Dukes, 57 F.3d at 358 (noting that the benefit contracted for under HMO plan is health care services).
 
 
 74
 It necessarily follows from this observation that appellants' hypothesis that they suffered financial losses as result of Aetna's failure to implement policies designed to increase the quality of health care is untenable. Their argument rests on the faulty proposition that Aetna's implementation of the policies and practices outlined in the complaint amounts to a failure to perform a specific promise to its members, and misconstrues the nature of Aetna's role and its ultimate duty in arranging and providing for its members' health care. See Dukes, 57 F.3d at 361 (noting that one of the HMO's roles is to arrange for the actual medical treatment for plan recipients). Indeed, while we do not quarrel with appellants' statement that Aetna implemented the managerial policies at issue while performing its role in arranging and providing medical treatment to its members rather than its role as plan administrator, see Tr. of Oral Arg. at 14-15, see also In re U.S. Healthcare, Inc., 193 F.3d at 162-63, that observation does not alter the fact that Aetna's contractual duty to its members is to provide medically necessary health care benefits in the form of covered services and supplies, i.e., medication, either directly or through contracts with third party medical providers. See id. at 162. Accordingly, we decline appellants' invitation to define Aetna's duties as narrowly as they suggest.[15]
 
 
 75
 It is evident to us from the foregoing analysis that given the nature of the property interests at stake, appellants' RICO injury theory predicated on the concept of a "diminution in product value" simply has no application here. Rather, in the context of this RICO suit based on what appellants have deemed to be "inferior" health insurance they received under Aetna's HMO plan, it follows from the nature of their property interests in their HMO memberships that they would be injured only to the extent that they could show that they suffered medical injuries, a denial or delay of medically necessary care, or the receipt of inferior or inadequate care. We emphasize that any personal injuries resulting from Aetna's policies and practices would not constitute a compensable RICO injury, see Genty, 937 F.2d at 918-19, Oscar, 965 F.2d at 786, but instead would serve as the necessary factual predicate for their argument that they suffered an injury to their property interests--their contractual rights to receive insurance coverage and necessary medical services under Aetna's HMO plan--which in turn caused them consequential financial loss in the form of overpayment for the coverage they actually received.
 
 B.
 
 76
 Apart from the analytical problem we described in the preceding discussion, we also reject appellants' theory of RICO injury resting on the purported diminution in product value because, even if we view Aetna's HMO plan as a "health care product" as appellants suggest, as a matter of simple logic, they obviously cannot show that they actually received something "inferior" and "worth less" absent individualized allegations concerning the quantity and quality of health care benefits Aetna provided under its HMO plan. Put differently, assuming arguendo that the injury claimed is predicated solely on the alleged financial loss of premium dollars stemming from appellants' purchase of an "inferior health care product," the harm alleged, i.e., overpayment, cannot exist absent proof of some level of inferior treatment under Aetna's HMO plan.
 
 
 77
 Appellants cannot reasonably deny that any argument to the contrary overlooks the fact that the level of health care services that one receives under a health insurance plan bears a direct relationship to the "quality" of the product, i.e., that person's health insurance, inasmuch as the point of procuring health insurance through an HMO plan is to secure the benefit of receiving necessary medical treatment. See Pegram, 120 S.Ct. at 2149 (stating that HMO is contractually bound to provide promised benefits, even if the cost of medically necessary treatment exceeds premiums paid); see also Dukes, 57 F.3d at 358 (noting that benefit contracted for by enrollees in HMO plan is health care services). Given that the concept of "quality" health insurance is tied inextricably to the level and adequacy of health care that Aetna's HMO members receive individually under Aetna's HMO plan, the conclusion that appellants' posit, i.e., that they have been harmed economically by Aetna's conduct in providing an inferior "product" in the form of inferior health insurance to its HMO enrollees, is provable only by reference to the level and adequacy of care that Aetna gave to its HMO members under its plan. Cf. Rosario, 963 F.2d 1016-17 (in evaluating plaintiffs' RICO fraud claim against beauty schools and owner, court cited testimony concerning substandard facilities, equipment and teachers which supported plaintiffs' assertion that the quality of education they received from defendants was poor, thus resulting in damages equal to the amount of loan payments incurred for educational purposes).
 
 
 78
 Indeed, we believe that appellants implicitly (albeit not intentionally) conceded this point at oral argument when we asked counsel to articulate their fraud theory and she gave the following response:
 
 
 79
 Our fraud theory is that Aetna misrepresented the type of health insurance coverage that its HMO would provide. It is not just based on the quality representations they've made, but its also based independently upon their promises that doctors make medical decisions, and that doctors are compensated pursuant to a scheme that enhances quality care, as well as the underlying omissions that are not disclosed and which clearly render these affirmative statements misleading.
 
 
 80
 And the fraud is that this is not what they give. Instead, they give you a policy, an HMO product which is of lesser value, because its systems--its systemic practices in fact give you less. It is totally inconsistent with their representations.
 
 
 81
 Tr. of Oral Arg. at 30-31 (emphasis added). Counsel's statement to the effect that the fraud (and consequently the RICO injury) in this case rests on the concept that Aetna's policies and practices "gave [appellants'] less" in terms of the health insurance coverage it provided through its HMO to its members highlights what we perceive as the fatal defect in appellants' RICO injury theory as they have articulated it. Simply put, appellants cannot demonstrate that Aetna's policies "gave [appellants] less" of a "health care product" than what Aetna promised to deliver in terms of the level and quality of health care coverage under its HMO plan unless they allege and prove that those systemic practices actually negatively affected the health care that Aetna provided to its HMO members through its participating providers.
 
 
 82
 In the circumstances, even according to appellants' articulated theory of RICO injury predicated on their loss of money from their purchase of an "inferior health care product," they nevertheless would be required to allege and prove that the level of care they received under Aetna's HMO plan actually was inferior to that which was promised, and therefore "worth less" than they paid for it. As we explained previously, any personal injuries that Aetna's enrollees might have suffered as a consequence of Aetna's management decisions would not constitute the RICO injury. Rather, the occurrence of an injury-causing event such as, for example, a denial of adequate care or a delay in treatment is viewed more appropriately as the contingency upon which appellants' economic damages are dependent.
 
 
 83
 In other words, allegations of the foregoing nature are necessary to provide the factual basis for appellants' otherwise conclusory allegation that they have been injured in their "property" because they overpaid for Aetna's inferior health care product. Cf. Briehl v. General Motors Corp., 172 F.3d 623, 628 (8th Cir. 1999) (rejecting plaintiffs' claim that their cars were "defective" because ABS system functioned in a manner that was counter-intuitive to drivers' natural braking tendencies and therefore "worth less" to consumers, stating "[w]here, as in this case, a product performs satisfactorily and never exhibits an alleged defect, no cause of action lies [for fraud, breach of implied warranty and violation of state consumer protection laws]. Since the Plaintiffs have failed to allege any manifest defect and their vehicles perform in a satisfactory manner, the District Court was correct when it dismissed the Plaintiffs' original complaint."). Absent such assertions of diminished benefits or care under Aetna's HMO plan, appellants simply cannot establish as a factual matter that they received anything less than what they bargained for and Aetna promised to provide, i.e., a quality health care product, and consequently cannot claim that they paid too much for the health insurance they received.
 
 C.
 
 84
 When we analyze appellants' argument as to why they need not plead and prove allegations concerning the level of care they received to establish the fact of damage, i.e., their RICO "injury to property," it becomes evident why their position is fundamentally flawed. Given the total absence of any particularized allegations to the effect that the medical care appellants received pursuant to Aetna's HMO plan was compromised or diminished as a consequence of Aetna's internal policies and practices, the fact of damage, according to appellants' theory of financial injury, obviously is predicated on the concept that the mere possibility that a physician might be influenced by Aetna's policies to provide substandard medical care to Aetna's enrollees as a class demonstrates that the health care insurance they actually received is inferior or "worth less" than the amount appellants expended in premium payments. As the district court described it, appellants' claim of out-of-pocket losses as articulated rests on "a vague allegation that quality of care may suffer in the future. . . ." Maio, 1999 WL 800315, at *2.
 
 
 85
 We agree with the district court's finding that this articulated theory of financial injury is insufficient to confer standing on appellants under RICO because it is premised solely on their conclusion that the economic value of the health insurance they purchased is reduced only because of the possibility that the quality of care administered under Aetna's health plan will suffer in some undefined way at some later point in the future. We understand appellants' theory in this regard to be as follows: the fact that the policies and practices described in the complaint exist make it a near certainty that they will receive diminished or compromised health care eventually, which in turn demonstrates that they have suffered a present economic loss in the form of overpayment for inferior health insurance.
 
 
 86
 But what appellants fail to realize is that the present economic harm they allege to have suffered necessarily is contingent upon the impact of events in the future which have not yet occurred. After all, as we previously pointed out, appellants pleaded that they are not seeking to recover for personal injury, denial of benefits or wrongful death already suffered. Moreover, appellants have confirmed that they do not claim that the quality of their health care was inadequate, and are not relying on their general averments that "benefits were reduced." In other words, according to appellants, the "inferior" nature of the health insurance, and consequently their financial loss, stems only from the high probability that given the nature of the policies and practices Aetna has implemented, they will receive something less than high quality health care when they need it, which in turn demonstrates that the health insurance is "inferior."
 
 
 87
 Inasmuch as this articulated theory of RICO injury is predicated exclusively on the possibility that future events might occur, rather than on the actual occurrence of those events and their present effect on the value of the health insurance appellants received, we agree with appellees that appellants' theory of present economic loss requires a significant degree of factual speculation, and is in that sense insufficient to support a cause of action under RICO. See Gelt Funding Corp., 27 F.3d at 768 (holding that lender suffered no present RICO injury stemming from allegedly fraudulently induced loans to borrowers where lender claimed out-of-pocket losses on account of outstanding undersecured loans prior to the completion of foreclosure proceedings on the loans; court rejected the "novel theory that [lender] was damaged simply by being undersecured when, with respect to those loans which had not yet foreclosed, the actual [monetary] damages it will suffer, if any," had not been determined); Oscar, 965 F.2d at 787 (where plaintiff claimed economic harm compensable under RICO because she allegedly possessed interest in leasehold that she could sublet but appellees' racketeering activity had the effect of reducing the rent she could charge, court rejected theory of financial injury as "purely speculative"; court observed that plaintiff 's complaint "never alleged that she ha[d] a right to sublet her apartment, and in any event, did not allege that she ever sublet the apartment, ever attempted to sublet the apartment, or . . . ever wished or intended" to do so); Dornberger, 961 F. Supp. at 522 (noting that plaintiff suffered no financial loss stemming from insurer's alleged failure to provide guaranty fund protection as promised in plaintiff 's insurance agreement, as "the guaranty fund would only become relevant upon [defendants'] insolvency, a future event whose occurrence is speculative"); see also In re Taxable Municipal Bond Sec. Litig., 51 F.3d 518, 523 (5th Cir. 1995) (holding that plaintiffs lacked standing under RICO because his damages claim "would have required extensive speculation and would not simply entail a calculation of present, actual damages"); Steele, 36 F.3d at 70-71 (noting that a showing of RICO injury requires proof of concrete financial loss); cf. Briehl, 172 F.3d at 626, 628-29 (where plaintiffs claimed economic injury in the form of a reduction in the resale value of cars with anti-lock break systems which allegedly performed "in a manner completely counter-intuitive to how an average driver is conditioned to respond when a hard braking maneuver is attempted," court rejected damages theory as predicated on economic harm (and a measure of damages) that was "too speculative to allow this case to go forward;" court noted that plaintiffs had not alleged that their ABS brakes malfunctioned or failed, had not alleged that they attempted to resell their vehicles, and had sought to set their damages as the difference between a vehicle with an ABS system that they expected and the system that actually is installed in each of their vehicles).
 
 
 88
 Overall, we are satisfied that if we were to permit appellants to proceed with their RICO claims based on allegations of monetary loss proved solely by reference to what they consider to be the existence of coercive internal policies and practices which inevitably will affect the quality of care they will receive in the future, we would be expanding the concept of RICO injury beyond the boundaries of reason. See DeMauro, 115 F.3d at 97 (noting that injury to property "is not an infinitely elastic concept"). Appellants posit that they have lost money because their health insurance is inferior as a result of Aetna's policies, but the only basis for their conclusion is their subjective determination that the policies and practices are so inherently unsound that they inevitably will serve as the impetus for physicians to provide substandard health care to their patients at the point at which the enrollees actually seek treatment.
 
 
 89
 If there were any doubt concerning the result we reach, which there is not, with respect to the message underlying appellants' damages theory, it surely would vanish when considered against the backdrop of the Supreme Court's recent decision in Pegram v. Herdrich, 120 S.Ct. 2143. Given our analysis, it is evident that in the absence of allegations that the quantity or quality of benefits have been diminished, the only theoretical basis for appellants' claim that they received an "inferior health care product" is their subjective belief that Aetna's policies and practices are so unfavorable to enrollees that their very existence in Aetna's HMO scheme demonstrates that they overpaid for the coverage they received. Indeed, the concept underlying appellants' injury theory is unmistakable--the very structure of Aetna's HMO plan is poor in the sense that its policies and practices inevitably will result in physicians providing inadequate health care to Aetna's HMO enrollees, which in turn means that appellants are paying too much for inferior health care benefits.
 
 
 90
 Put differently, we believe that the not-so hidden message underlying appellants' RICO claims (and more specifically their injury theory) is as follows: while these policies might be good for Aetna's business (because that they promote increased profits and induce physicians to ration care), they certainly are not beneficial to Aetna's HMO members because they are medically unsound in that they restrict a physician's ability to make independent medical judgments and encourage physicians to withhold otherwise appropriate health care so as to increase Aetna's "bottom line" profits.[16] See generally Pegram, 120 S.Ct. at 2149 (discussing financial structure of HMOs and the fact that profits are tied to physicians' rationing care); Herdrich v. Pegram, 154 F.3d 362, 375-78 (7th Cir. 1998) (citing and discussing views of various critics of HMOs), rev'd, 120 S.Ct. 2143 (2000); Clark C. Havighurst, Vicarious Liability: Relocating Responsibility for the Quality of Medical Care, 26 Am. J. L. & Med. 7 (2000) (opening article with observation that "[m]anaged health care has recently generated a great deal of distrust, even anger, in the public mind"); Edith M. Kallas et al., Class Actions in the Heathcare Context, SE 34 ALI-ABA 505, 508 (Oct. 1999) (noting generally that there are "many ways in which the structure of the healthcare industry today is particularly apt to cause harm to classes of similarly situated individuals"). Thus, we think it fair to characterize appellants' injury theory as bottomed on the notion that Aetna's policies challenged in the complaint render its HMO structure "bad" in comparison to the other types of health care insurance available in the marketplace.[17]
 
 
 91
 The force of this position, we believe, has been undermined significantly by the Supreme Court's recent decision in Pegram in which the Court rejected the plaintiff 's attempt to challenge the existing structure of an incentive scheme of one particular HMO under the rubric of a breach of fiduciary duty claim under ERISA. In Pegram, the plaintiff sued her health maintenance organization and its related entities (collectively "Carle"), claiming that Carle's HMO structure, which rewarded its physician/owners for rationing medical care in the form of a "year-end bonus," entailed an "inherent or anticipatory breach" of its fiduciary duty to its participants. See Pegram, 120 S.Ct. at 2153. In rejecting the Court of Appeals for the Seventh Circuit's attempt to limit its holding to the particular structure of Carle's HMO, the Supreme Court recognized that federal courts are not in a position to judge the social value of one HMO structure over another, because "any legal principle purporting to draw a line between good and bad HMOs would embody, in effect, a judgment about socially acceptable medical risk." Id. at ____, 120 S.Ct. at 2150. The Court explained the reasons why it believed that any attempt to distinguish among various HMO schemes was unwise:
 
 
 92
 A valid conclusion of this sort would, necessarily, turn on facts to which courts would probably not have ready access: correlations between malpractice rates and various HMO models, similar correlations involving fee- for-service models, and so on. And, of course, assuming such material could be obtained by courts in litigation like this [under ERISA], any standard defining the unacceptably risky HMO structure (and consequent vulnerability to claims like Herdrich's) would depend on a judgment about the appropriate level of expenditure for health care in light of the associated malpractice risk. But such complicated fact finding and such a debatable social judgment are not wisely required of courts unless for some reason resort cannot be had to the legislative process, with its preferable forum for comprehensive investigations and judgments of social value, such as optimum treatment levels and health care expenditure.
 
 
 93
 Id. Given these observations, the Court proceeded to its substantive analysis of the plaintiff 's ERISA count on the assumption that the types of decisions listed in the plaintiff 's complaint, what the Court termed "mixed eligibility and treatment decisions,"[18] could not be subject to a breach of fiduciary claim unless all such decisions by all HMOs were subject to the same sort of claims. See id. at ___ _ ___, 120 S.Ct. 2150-51 ("We think, then, that courts are not in a position to derive a sound legal principle to differentiate an HMO like Carle from other HMOs.").
 
 
 94
 Ultimately, the Court held that the plaintiff 's complaint failed to plead a valid breach of fiduciary duty claim against Carle. Specifically, the Court determined that Carle should not be treated as an ERISA fiduciary to the extent that it makes mixed eligibility and treatment decisions acting through its physician/owners. The Court rejected the plaintiff 's claim based in large part on the compelling policy considerations that supported its result:
 
 
 95
 Our doubt that Congress intended the category of fiduciary administrative functions to encompass the mixed determinations at issue here hardens into conviction when we consider the consequences that would follow from Herdrich's contrary view. . . .[W]e need to ask how this fiduciary standard would affect HMOs if it applied as Herdrich claims it should be applied, not directed against any particular mixed decision that injured a patient, but against HMOs that make mixed decisions in the course of providing medical care for profit. Recovery would be warranted simply upon showing that the profit incentive to ration care would generally affect mixed decisions, in derogation of the fiduciary standard to act solely in the interest of the patient without possibility of conflict. Although Herdrich is vague about the mechanics of relief, the one point that seems clear is that she seeks the return of profit from the pockets of [respondent's] HMO owners, with the money to be given to the plan for the benefit of the participants. . . . Since the provision for profit is what makes the HMO a proprietary organization, her remedy in effect would be nothing less than elimination of the for-profit HMO. . . . It is enough to recognize that the Judiciary has no warrant to precipitate the upheaval that would follow a refusal to dismiss Herdrich's ERISA claim. The fact is that for over 27 years the Congress of the United States has promoted the formation of HMO practices. . . . [T]he Federal Judiciary would be acting contrary to the congressional policy of allowing HMO organizations if it were to entertain an ERISA fiduciary claim portending wholesale attacks on existing HMOs simply because of their structure, untethered to claims of concrete harm.
 
 
 96
 Id. at ___ _ ___, 120 S.Ct. 2156-57.
 
 
 97
 We read the Court's approach in Pegram as undermining the validity of appellants' RICO injury theory predicated on the notion that their health insurance was rendered "inferior" by Aetna's implementation of its managerial policies outlined in the complaint. In particular, given that the very concept underlying appellants' economic harm is the notion that the structure of Aetna's HMO plan is faulty, we cannot ignore the circumstance that appellants' injury theory in essence asks us to pass judgment on the legal validity of the policies and practices themselves. Accordingly, we find particularly compelling that aspect of Pegram which articulated clearly the myriad of practical problems which undoubtedly arise in a situation in which the federal courts are asked to determine the social utility of one particular HMO structure as compared to another. See id. at 2150. Indeed, we believe that the Court's observations in evaluating the validity of the plaintiff 's ERISA claim in that case apply with equal force where, as here, appellants' theory of economic injury is predicated on the notion that the structure of Aetna's HMO plan, with its "coercive and restrictive" internal policies and practices, renders the health insurance appellants actually received from Aetna less valuable than it otherwise would have been without those management decisions in place.
 
 
 98
 The critical point here is that if we were to accept appellants' argument that the fact of damage can be demonstrated without specific reference to the level or quality of care actually provided to them under Aetna's HMO plan, we would be making the social and medical judgment that the particular structure of Aetna's HMO plan, by its very nature, places it in the category of a "bad HMO" as opposed to a "good HMO." There is no escaping that analytical step because it is the very nature of Aetna's HMO's structure which, according to appellants' theory, demonstrates that the economic value of their health insurance is reduced, that their insurance is inferior, and that they paid too much in premium dollars for what they actually received. But it seems clear that in view of the Supreme Court's reluctance in Pegram to devise a uniform standard by which federal courts could distinguish one HMO scheme from another in terms of its social utility in the context of an ERISA breach of fiduciary duty claim, we must decline appellants' invitation to pass judgment on the social utility of Aetna's particular HMO structure, albeit in the context of evaluating whether appellants have stated an injury to property under section 1964(c) of RICO. We especially are constrained to reach our result in light of the fact that appellants ask us to make such a determination without reference to the level or quality of care that Aetna's HMO members received while enrolled in its health plan. Cf. id. at ___, 120 S.Ct. at 2157 ("[T]he Federal Judiciary would be acting contrary to the congressional policy of allowing HMO organizations if it were to entertain an ERISA fiduciary claim portending wholesale attacks on existing HMOs solely because of their structure, untethered to claims of concrete harm.").
 
 
 99
 We also point out that appellants' complaint in effect asks that the trier of the fact inappropriately act as a state regulatory commission and determine the value of Aetna's product. After all the essence of appellants' claims is that they overpaid for the product delivered. Thus, at a trial of this case the trier of the fact would have to determine the value of what Aetna provided. We reject the notion that in the complex world of rate structures a trier of the fact, probably a jury, can make such a determination.
 
 
 100
 In any event, inasmuch as we read Pegram as suggesting that federal courts are ill-equipped to make the kind of social judgment that our acceptance of appellants' injury theory would require us to make, we remain convinced that in order to demonstrate the fact of RICO injury to property in the context of this case, appellants are required to demonstrate that the benefits they received under Aetna's HMO plan were compromised or diminished as a direct consequence of the systemic practices alleged in the complaint. Appellants therefore must allege and prove, for example, that they suffered personal injuries, were denied benefits, or received delayed or inadequate treatment because of the structure of Aetna's HMO plan. In the absence of such allegations, the district court's dismissal was appropriate.
 
 D.
 
 101
 Appellants make one additional argument that we will address briefly. Notwithstanding that appellants have stated unequivocally that they do not allege, nor intend to prove in this case that the quality of care they actually received pursuant to Aetna's HMO plan was compromised or diminished as a result of Aetna's "systemic policies," they contend nevertheless that their allegations of economic damage are sufficient at this early stage in the proceedings to demonstrate that they suffered an injury to property sufficient to confer standing upon them under RICO to challenge Aetna's allegedly fraudulent misrepresentations and omissions. They point out that the Supreme Court has held that " `[a]t the pleading stage, general factual allegations of injury resulting from defendants' conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim.' " See br. at 39 (quoting National Organization for Women, Inc. v. Scheidler , 510 U.S. 249, 256, 114 S.Ct. 798, 803 (1994), quoting in turn Lujan, 504 U.S. at 561, 112 S.Ct. at 2137). Essentially, they appear to claim that our standard of review on a motion to dismiss dictates that they should be given the benefit of the doubt that they have suffered tangible economic harm.
 
 
 102
 Appellants' reliance on this principle is misplaced, for while at the pleading stage we must accept as true all factual allegations in the complaint and give plaintiffs the benefit of all reasonable inferences, it is well settled that "we need not accept as true unsupported conclusions and unwarranted inferences." See West Penn Power Co., 147 F.3d at 263 n.13. Inasmuch as there are no allegations in the complaint to the effect that appellants have received inadequate care, suffered medical injuries, or have been denied medically necessary care, the fair inference to be drawn from the complaint, indeed the only inference that could be drawn in view of appellants' arguments before us, is that none of those events have occurred. See Angus v. Shiley, 989 F.2d 142, 146-47 (3d Cir. 1993) ("The only fact that was not explicitly set forth in the complaint on which the court relied . . . was that the valve had not failed. Yet that is the fair inference to be drawn from the complaint for Angus did not plead that the valve had malfunctioned."). In the absence of allegations concerning the quality and quantity of benefits that each appellant received, and given the disclaimers stated in the complaint, appellants' general assertion of an "injury to property" amounts to an "unwarranted conclusion" that we need not accept as true for purposes of evaluating the sufficiency of the complaint.
 
 
 103
 Moreover, given appellants' concessions in the complaint, which were explicated further in their arguments before us, we cannot presume from their general allegation of injury that appellants can prove "those specific facts" which we deem essential to support their claim of injury to their property. Obviously we cannot do so where, as here, appellants state specifically that the facts concerning the quality and quantity of care they received are not germane to their RICO claims. Consequently, the procedural rule that requires us to "presume specific facts from general allegations" does not apply in this situation. Simply put, the result we reach is completely consistent with the appropriate standard of review on a motion to dismiss the complaint and is compelled in view of the facts and the law as we have stated it.[19]
 
 V. CONCLUSION
 
 104
 Based on the information pleaded in the complaint, we hold that appellants have failed to allege the facts necessary to support their assertion that they paid too much for the health insurance they received from Aetna. Specifically, appellants have not alleged, for example, that they suffered medical injuries, received inadequate or inferior care, or sought but were denied necessary care as a consequence of the structure of Aetna's HMO plan, which includes the "systemic policies and practices" challenged in the complaint. In the circumstances, appellants cannot establish that they suffered a cognizable "injury to business or property" flowing from appellees' conduct, an essential element of a civil action pursuant to section 1964(c) of RICO.
 
 
 105
 For the foregoing reasons, the district court's judgment of September 29, 1999, will be affirmed.
 
 
 
 NOTES:
 
 
 *
 Hon. Murray M. Schwartz, Senior Judge of the United States District Court for the District of Delaware, sitting by designation.
 
 
 [1]
 For convenience, we will refer to Aetna-U.S. Healthcare, Inc.'s HMO plan as "Aetna's HMO." See JA-21, JA-27. Aetna's HMO is an individual practice association model HMO in which Aetna contracts with physicians, groups of physicians, and medical centers who agree to provide care to HMO members in addition to other, non-HMO affiliated patients. JA-27.
 
 
 [2]
 Appellants' brief recites other representations made in the Handbook, claiming that they were false and misleading. Br. at 11 (noting that the Handbook states that "when medically necessary, your primary care physician may refer you to a specialist or facility for treatment or for covered preventative care services," and further stating that "members have a right to `have a doctor decide when coverage treatment should be denied.' "); see also JA-330, JA-340. Because these statements are not mentioned in the complaint, we need not consider them in our analysis, although if we did our result would be the same.
 
 
 [3]
 18 U.S.C. S 1962 provides in pertinent part:
 (a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall not be unlawful under this subsection if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their accomplices in any pattern or racketeering activity or the collection of an unlawful debt after such purchase do not amount in the aggregate to one percent of the outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer.
 (c) It shall be unlawful for any person employ ed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
 (d) It shall be unlawful for any person to con spire to violate any of the provisions of subsection (a), (b), or (c) of this section.
 
 
 [4]
 The order actually states that the state law claims were dismissed "FOR LACK OF SUBJECT MATTER JURISDICTION," see Appellants' br., app. at 6, but the district court's opinion clarifies that it intended to decline, in its discretion, to exercise supplemental jurisdiction over the remaining non-federal claims as provided in 28 U.S.C. S 1367(c)(3).
 
 
 [5]
 We note parenthetically that neither the district court nor the parties addressed the fact that the complaint actually pleads violations of three different subsections of 18 U.S.C. S 1962. See note 3, supra. As previously mentioned, count I states that the appellees' conduct violated sections 1962(c) and (d), and count II alleges that their conduct violated sections 1962(a) and (d). Obviously, given that the district court dismissed the RICO claims primarily because it found that appellants failed to allege any RICO injury to property under section 1964(c), it was unnecessary for the court to address the two counts separately. Inasmuch as we also have determined that appellants' RICO claims are deficient because they fail to allege facts which, if established, would prove the damages element under RICO, our analysis treats the separate federal claims as one.
 
 
 [6]
 The district court also addressed and denied appellees' motion for sanctions pursuant to Fed. R. Civ. P. 11. This aspect of the district court's order is not at issue on this appeal. Similarly, appellants do not challenge specifically the district court's dismissal of their state law claims without prejudice pursuant 28 U.S.C. S 1367(c)(3). Rather, their argument apparently is that in the event that we reverse the district court's dismissal of their RICO claims and remand for further proceedings, we should order that the district court reinstate their state law claims on remand. Given the result we reach on the federal claims, the district court acted well within its discretion in dismissing appellants' state law claims pursuant to 28 U.S.C. S 1367(c)(3). Accordingly, we will not address the issue in any further detail.
 
 
 [7]
 Preliminarily, we point out that we have not overlooked the fact that appellees moved to dismiss on standing grounds pursuant to Rule 12(b)(1), claiming that the nature of appellants' injury allegations demonstrated that they suffered no cognizable "injury in fact" under section 1964(c) of RICO, and therefore that the district court lacked subject matter jurisdiction over appellants' federal claims pursuant to Article III of the United States Constitution. See Aetna's Br. in Supp. of Mot. to Dismiss at 12 (no. 3 on district court docket). Given that the district court's order did not state whether it was dismissing the RICO claims under Rule 12(b)(1) or Rule 12(b)(6), the legal basis for the court's ruling is unclear. The court's ambiguity on this point, in turn, raises the question of whether the order should have been denominated a dismissal under Rule 12(b)(6) or Rule 12(b)(1), given that the basis for the court's ruling was a perceived lack of RICO injury "to business or property" sufficient to confer "standing" to sue under section 1964(c). Generally speaking, motions to dismiss on the grounds of a failure to allege an "injury in fact" implicate constitutional standing principles and thus are predicated on Rule 12(b)(1) rather than Rule 12(b)(6). See, e.g., Society Hill Towers Owners' Ass'n v. Rendell, 210 F.3d 168, 175 (3d Cir. 2000) (defendants challenged plaintiffs' standing pursuant to motion to dismiss under Rule 12(b)(1)). And in view of the district court's statement that appellants' allegations failed to demonstrate an "injury in fact," it appears as if the court's dismissal was pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction rather than under 12(b)(6) for failure to state a claim.
 While we have designated section 1964(c) as the "standing" provision of RICO, see Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., 140 F.3d 494, 520-21 (3d Cir. 1998), we point out that our method of analysis in prior cases has been to consider issues of RICO and antitrust standing in the context of reviewing motions to dismiss pursuant to Rule 12(b)(6), despite the fact that the "injury to business or property" and proximate causation requirements are considered aspects of the plaintiff 's "standing" to sue under section 1964(c) of RICO and section 4 of the Clayton Act. See, e.g. Steamfitters Local Union No. 420 Welfare Fund, 171 F.3d 912, 919, 921 (3d Cir. 1999) (stating that it is appropriate to consider proximate cause requirement in section 1964(c) under the rubric of the standing doctrine and addressing the proximate causation issue, a separate requirement in section 1964(c), in the context of reviewing district court's dismissal pursuant to Fed. R. Civ. P. 12(b)(6)), cert. denied, 120 S.Ct. 844 (2000); see also In re: Warfarin Sodium Antitrust Litig., 214 F.3d 395, 397-99 (3d Cir. 2000) (addressing antitrust standing concepts in context of reviewing motion to dismiss pursuant to Rule 12(b)(6)); City of Pittsburgh v. West Penn Power Co., 147 F.3d 256, 264 (3d Cir. 1998) (same); compare DeMauro v. DeMauro, 115 F.3d 94, 96 (1st Cir. 1997) (reviewing standing issue under 1964(c) based on allegations in the pleadings; court noted in passing that "[t]here is plainly a case or controversy under Article III; but the statutory precondition of injury to business or property must be met."); Oscar v. University Students Co-Operative Ass'n, 965 F.2d 783, 784-87 (9th Cir. 1992) (en banc) (addressing RICO injury requirement set forth in section 1964(c) in context of reviewing district court's dismissal pursuant to Rule 12(b)(6); cf. Associated General Contractors of Cal., Inc. v. California State Council of Carpenters, 459 U.S. 519, 529, 103 S.Ct. 897, 903-04 (1983) (addressing proximate causation requirement in analogous provision found in section 4 of the Clayton Act; proximate causation is but one aspect of "antitrust standing" and the Court addressed plaintiff 's standing to sue in context of reviewing motion to dismiss pursuant to Rule 12(b)(6)). But see Moore v. PaineWebber, Inc., 189 F.3d 165, 169 n.3 (2d Cir. 1999) ("Because loss causation is an element of standing to sue under the RICO statute, the appropriate ground for dismissal for failure to plead loss causation would seem to be the lack of subject matter jurisdiction rather than the plaintiffs' failure to state a claim.").
 While we appreciate the distinction between a dismissal for lack of subject matter jurisdiction under Rule 12(b)(1) and a dismissal for failure to state a claim under Rule 12(b)(6), we need not resolve which is the correct approach in the context of this case, as the appellants interpret the dismissal as grounded on Rule 12(b)(6), see br. at 16-17, and appellees have not challenged appellants' characterization in that regard. Inasmuch as the appellants treat the dismissal as one pursuant to Rule 12(b)(6), there is no prejudice to appellants in our reviewing the district court's dismissal as if it were grounded on Rule 12(b)(6), and we will treat it as such. See Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991) (noting that a plaintiff may be prejudiced if what is, in essence, a Rule 12(b)(6) challenge to the complaint is treated as a Rule 12(b)(1) motion, but that there was no prejudice in treating district court's Rule 12(b)(1) dismissal as one predicated on Rule 12(b)(6), especially where plaintiffs treated it as such); see also Children's Seashore House v. Waldman, 197 F.3d 654, 657 n.1 (3d Cir. 1999), cert. denied, 120 S.Ct. 2742 (2000).
 
 
 [8]
 Section 1964(c) provides in its entirety:
 (c) Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962. The exception contained in the preceding sentence does not apply to an action against any person that is criminally convicted in connection with the fraud, in which case the statute of limitations shall start to run on the date on which the conviction becomes final.
 
 
 [9]
 Obviously section 1964(c) also requires a plaintiff to establish a violation of section 1962. See Gelt Funding Corp., 27 F.3d at 767. As previously mentioned, appellants' RICO claims are predicated on alleged violations of sections 1962(a), (c), and (d). Inasmuch as this element of section 1964(c) is not germane to the issues presented in this appeal, we will not discuss it. We further point out in passing that appellants' RICO claims were based on appellees' alleged predicate acts which they claimed violated 18 U.S.C. SS 1341, 1343, and 2314.
 
 
 [10]
 At oral argument, appellants' counsel confirmed that appellants are claiming that their economic injury is that they paid too much for the health insurance they received:
 THE COURT: [T]he question is this . . . what would [be] the damages that you would propose to show here[.] [W]ould you say that [appellants] paid too much for what they got?
 [APPELLANTS' COUNSEL]: Yes. We are saying that they paid too much for what they got.
 THE COURT: And then you would have a jury then, I gather, say that the premium, instead of being, and I'm only taking a number, $150 per month for each person enrolled, and I know there are different levels and all that, should be $130, something like that.
 [APPELLANTS' COUNSEL]: Yes.
 Tr. of Oral Arg. at 9-10; see also Tr. of Oral Arg. at 21 ("[T]hat is our loss. They paid too much, which states a RICO claim, an injury to property.").
 
 
 [11]
 Appellants utilize the phrase "inferior" throughout their brief to describe the health insurance they received from Aetna, see, e.g., br. at 18, 26, 28, but at oral argument, they characterized the insurance simply as "different" from that which was represented to them. See Tr. of Oral Arg. at 19 ("They didn't get the product that was represented."). While we are not certain whether the different description was intentional, we point out that if the health insurance simply was different than that which was promised to appellants, there would be no factual basis for an argument that they overpaid, inasmuch as a "different" but equally good health insurance package would have an equivalent economic value. According to appellants, their loss stems from the fact that they paid too much in premiums for health insurance of lesser value. See Tr. of Oral Arg. at 31 ("And the fraud is that this is not what [Aetna] give[s]. Instead, [Aetna] give[s] you a policy, an HMO product which is of a lesser value, because its systems--its systemic practices, in fact, give you less. Its totally inconsistent with their representations."). Obviously, then, Aetna's health insurance could not be characterized as "worth less" in monetary value unless it was inferior in some respect to that for which they contracted.
 Accordingly, we must analyze appellants' RICO injury theory as premised on the notion that Aetna's health insurance "product" is inferior to that which it promised to deliver. It is inferior, according to appellants, because of the existence of the policies and practices outlined in the complaint. See id.; see also id. at 3-4 ("The fact of injury is demonstrated by the vast disparity between the economic value of the premium HMO product that Aetna represented" and that which appellants received, as evidenced by their "allegations which support undisclosed systemic practices which directly contrast those promises").
 
 
 [12]
 Preliminarily, we note that while this case involves a motion to dismiss under Rule 12(b)(6), the Supreme Court recently confirmed that we may use appellants' brief "to clarify allegations in the complaint whose meaning is unclear." See Pegram, 120 S.Ct. at 2155 n.10 (citing, inter alia, Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group Ltd., 181 F.3d 410, 428 n.8 (3d Cir. 1999)). It seems equally clear that we may consider statements made by counsel at oral argument for that same purpose. See Alicke v. MCI Communications Corp., 111 F.3d 909, 911 (D.C. Cir. 1997) ("At oral argument counsel for Alicke clarified that, notwithstanding the reference to advertising in the complaint, her allegations are directed only to the representations contained in MCI's bills.") (cited in Pegram, 120 S.Ct. at 2155 n.10).
 Moreover, while our standard of review requires us to accept as true all factual allegations in the complaint, "we need not accept as true `unsupported conclusions and unwarranted inferences.' " West Penn Power Co., 147 F.3d at 263 n.13 (quoting Schuylkill Energy Resources, Inc. v. Pennsylvania Power & Light Co., 113 F.3d 405, 417 (3d Cir. 1997)). "[C]ourts have an obligation in matters before them to view the complaint as a whole and to base rulings not upon the presence of mere words but, rather, upon the presence of a factual situation which is or is not justiciable. We do draw on the allegations of the complaint, but in a realistic, rather than a slavish, manner." Id. at 263. Also, inasmuch as appellants' RICO claims were based upon alleged misrepresentations set forth in appellees' marketing, advertising and membership materials disseminated to prospective HMO plan enrollees, and provisions in Aetna's provider agreements, we may examine and consider those materials in resolving this appeal. See In re Burlington Coat Factory Sec. Litig., 114 F.3d at 1426.
 
 
 [13]
 Appellants assert in their brief that the district court erred in not recognizing that their complaint actually stated several times that appellees' policies have compromised the quality of benefits that appellants have received under Aetna's HMO plan. See br. at 29 n.11 ("Contrary to the district court's remark, . . . the Complaint is replete with allegations that defendants' undisclosed systemic policies and practices actually `reduced the quality' of benefits received."). But according to appellants, the district court's purported error in that regard was harmless, inasmuch as they explain that their allegations to that effect are "not essential to the fraud claim asserted here." Id.
 At oral argument, counsel for appellants further clarified that, notwithstanding the general references in the complaint to the reduced quality of care that Aetna's HMO members have received as a result of Aetna's policies and practices, it is their unequivocal position that those allegations are not essential to their RICO claim, given the type of economic harm they claim:
 THE COURT: Is there any allegation in the complaint that anyone received inferior care, anything other than high quality care? Is there any allegation in the Complaint that the physician made medical decisions he or she would not have made but for Aetna's policies.
 [APPELLANTS' COUNSEL]: No. There is no such allegation. There is an allegation that benefits were reduced. But I do not believe or we do not--our position is that what the doctor does or doesn't do is irrelevant. . .
 THE COURT: Doesn't that have something to do with quality?
 [APPELLANTS' COUNSEL]: It doesn't in terms of what Aetna has represented. And, if I may, the District Court I think had a misunderstanding of the way the HMOs operate. And this Court's decision in the Bauman case illustrates this point. In Bauman, this Court noted that HMOs play different roles. A role as a plan administrator, which is what I believe the District Court was focusing on, under which it makes benefit determinations and its conduct is subject to ERISA. But a separate role, the role that's at issue here, as a provider of medical services under which it arranges and provides for medical treatment.
 Aetna represented that it was going to increase access to this quality of care. And it is this conduct that the Bauman court, this Court, recognized is subject to the prevailing standard of care.
 Tr. of Oral Arg. at 13-15. From this colloquy, we understand appellants as disclaiming reliance on their ambiguous assertions in the complaint that appellees' policies actually have reduced the quality of benefits that appellants and members of the purported class received under Aetna's plan. Of course, as we previously mentioned, see supra note 12, we will evaluate the sufficiency of the complaint's allegations and the legal theories articulated in support thereof in accordance with appellants' clarifications. See Pegram, 120 S.Ct. at 2155 n.10 (noting that courts may use parties' briefs to clarify allegations in complaint whose meaning is unclear); see also Alicke, 111 F.3d at 911 (utilizing counsel's statements at oral argument to clarify allegations in complaint and nature of plaintiff 's claim).
 
 
 [14]
 Ignoring the distinction between one's interest in real and personal property on the one hand, and the type of property interest conveyed under a contract, appellants rely substantially on the analysis of the Court of Appeals for the Eighth Circuit in Bennett v. Berg, 685 F.2d 1053, 1058 (8th Cir. 1982), aff'd on reh'g , 710 F.2d 1361 (8th Cir. 1983), in which the court found that the plaintiffs' complaint pleaded a valid injury to property under RICO based on their allegation that the value of their contracts for "life care" was different than they were led to expect through the defendants' promises. The outcome in Bennett is of little help to appellants because the case did not involve a contract for health insurance. Moreover, it did not consider the point we make in the text, namely that economic damages based on a decrease in property value occur in situations in which the property right at issue is tangible, i.e., real or personal property. In any event, to the extent that the result in Bennett may be inconsistent with our reasoning, we will not follow it.
 
 
 [15]
 Appellants intimate that because their complaint is predicated on conduct by Aetna in its role as medical provider rather than its role of benefits administrator, it is not necessary that they demonstrate that benefits have been denied, reduced or delayed as a consequence of Aetna's systemic policies and practices. See Tr. of Oral Arg. at 14-15 (citing In re U.S. Healthcare, Inc. and suggesting that the district court's analysis confused Aetna's two roles). We cannot agree. We do not read Dukes v. U.S. Healthcare, Inc., 57 F.3d 350, or In re U.S. Healthcare, Inc., 193 F.3d 151, as suggesting that appellants could establish economic harm in the circumstances presented here absent proof that Aetna's policies and practices actually caused its HMO enrollees' level of health care to be diminished or compromised. Indeed, those cases addressed the totally separate issue of whether certain state law negligence claims brought against U.S. Healthcare, Inc. were subject to complete preemption under section 502(a) of ERISA, 29 U.S.C. S 1132(a). See In re U.S. Healthcare, Inc., 193 F.3d at 155 (describing issue presented there and in Dukes).
 
 
 [16]
 We only need cite a few examples from the complaint to demonstrate what we perceive to be at the core of appellants' RICO claims--their ultimate dissatisfaction with the policies and practices outlined in the complaint:
 68. As a result of these and other systemic practices, defendants have significantly interfered with the physician's medical decision- making process and have substantially reduced the quality of care appellants and the class members receive.
 69. In fact, Aetna's practices have come under considerable scrutiny from physicians, including the American Medical Association ("AMA"), who have criticized the terms of the provider agreements as reducing the overall quality and amount of healthcare services provided to HMO members and restricting the physician's ability to make independent medical decisions regarding a patient's healthcare.
 . . . .
 75. The AMA also specifically identified the following clauses in the provider agreements which restrict a physician's ability to practice medicine and reduce the quality [of] health care provided to plan members:
 . . . .
 - Interference with medical decision-making, defining covered services in terms of medical necessity and giving Aetna-USHC the final authority to supersede a physician's determination regarding the necessity of medical care; defining medical necessity by focusing minimally on clinical medicine and instead . . . on cost and convenience to the plan, leaving out any role for the treating physician to determine medical necessity.
 JA-40 to JA-43. Indeed, the complaint also documents in several paragraphs various AMA press releases which criticize, among other things, the nature of Aetna's provider contracts and financial incentives. See, e.g., JA-41 (quoting AMA press release stating that "[w]e believe these contracts clearly are not in the patient's best interest. . . . These provisions completely blur the line between services that are medically necessary and services that the plan simply does not want to cover.") (alteration in original); JA-43 (quoting AMA press release stating "[w]e have received numerous complaints from physicians around the country both about the non-negotiability of [Aetna's] contracts and about provisions that potentially undermine the patient-physician relationship."); JA-47 ("Aetna's most recent contract embarrassment came last month, when four Aetna-owned HMOs were among six managed care plans sued by the Texas Attorney General for contract provisions that allegedly amounted to illegal payoffs to doctors to limit patient care and penalties to those who did not.") (alteration in original); JA-48 (quoting statement from AMA which pointed out that "for the past year, the AMA has attempted to convince Aetna to ease harmful practices that are not in the best interests of patient care and adopt practices that will restore trust on the part of patients and physicians").
 
 
 [17]
 We further point out that appellants' broad statements in the complaint to the effect that appellees' policies and practices actually "reduced the quality of health care" its members received only serve to highlight the point we make in the text. Indeed, appellants' vague allegations that the policies and practices in and of themselves demonstrate that the level of benefits is reduced confirm that appellants' RICO claims, at bottom, are predicated on the notion that Aetna's particular HMO structure is legally objectionable. See, e.g., JA-40 ("As a result of these and other systemic practices, defendants have significantly interfered with the physician's medical decision-making process and have substantially reduced the quality of care plaintiffs and the Class members receive.").
 (Text continued on page 18) demonstrated that they suffered no cognizable "injury in fact" under section 1964(c) of RICO, and therefore that the district court lacked subject matter jurisdiction over appellants' federal claims pursuant to Article III of the United States Constitution. See Aetna's Br. in Supp. of Mot. to Dismiss at 12 (no. 3 on district court docket). Given that the district court's order did not state whether it was dismissing the RICO claims under Rule 12(b)(1) or Rule 12(b)(6), the legal basis for the court's ruling is unclear. The court's ambiguity on this point, in turn, raises the question of whether the order should have been denominated a dismissal under Rule 12(b)(6) or Rule 12(b)(1), given that the basis for the court's ruling was a perceived lack of RICO injury "to business or property" sufficient to confer "standing" to sue under section 1964(c). Generally speaking, motions to dismiss on the grounds of a failure to allege an "injury in fact" implicate constitutional standing principles and thus are predicated on Rule 12(b)(1) rather than Rule 12(b)(6). See, e.g., Society Hill Towers Owners' Ass'n v. Rendell, 210 F.3d 168, 175 (3d Cir. 2000) (defendants challenged plaintiffs' standing pursuant to motion to dismiss under Rule 12(b)(1)). And in view of the district court's statement that appellants' allegations failed to demonstrate an "injury in fact," it appears as if the court's dismissal was pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction rather than under 12(b)(6) for failure to state a claim.
 While we have designated section 1964(c) as the "standing" provision of RICO, see Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., 140 F.3d 494, 520-21 (3d Cir. 1998), we point out that our method of analysis in prior cases has been to consider issues of RICO and antitrust standing in the context of reviewing motions to dismiss pursuant to Rule 12(b)(6), despite the fact that the "injury to business or property" and proximate causation requirements are considered aspects of the plaintiff 's "standing" to sue under section 1964(c) of RICO and section 4 of the Clayton Act. See, e.g. Steamfitters Local Union No. 420 Welfare Fund, 171 F.3d 912, 919, 921 (3d Cir. 1999) (stating that it is appropriate to consider proximate cause requirement in section 1964(c) under the rubric of the standing doctrine and addressing the proximate causation issue, a separate requirement in section 1964(c), in the context of reviewing district court's dismissal pursuant to Fed. R. Civ. P. 12(b)(6)), cert. denied, 120 S.Ct. 844 (2000); see also In re: Warfarin Sodium Antitrust Litig., 214 F.3d 395, 397-99 (3d Cir. 2000) (addressing antitrust standing concepts in context of reviewing motion to dismiss pursuant to Rule 12(b)(6)); City of Pittsburgh v. West Penn Power Co., 147 F.3d 256, 264 (3d Cir. 1998) (same); compare DeMauro v. DeMauro, 115 F.3d 94, 96 (1st Cir. 1997) (reviewing standing issue under 1964(c)
 
 
 [18]
 The Court noted that physicians routinely make mixed eligibility and treatment decisions in the course of treating patients, and explained the concept of a mixed eligibility and treatment decision by providing examples:
 The kinds of decisions mentioned in Herdrich's ERISA count and claimed to be fiduciary in character are just such mixed eligibility and treatment decisions: physicians' conclusions about when to use diagnostic tests; about seeking consultations or making referrals to physicians and facilities other than Carle's; about proper standards of care, the experimental character of a proposed course of treatment, the reasonableness of a certain treatment, and the emergency character of a medical condition.
 Pegram, 120 S.Ct. at 2154-55.
 
 
 [19]
 We address one final point. Appellants contend that the district court erred in dismissing their RICO claims with prejudice without addressing their request for an opportunity to replead their RICO claims to "cure any perceived deficiencies." See br. at 61. While appellants did not file an amended complaint or a formal motion for leave to amend before the district court, they asked for the opportunity to amend their complaint at the conclusion of their brief in opposition to appellees' motions to dismiss. Appellants assert that the district court abused its discretion in not addressing their request, in that it "did not hold that amendment of the complaint would be futile. Appellants were never afforded an opportunity to amend their complaint, which they possessed as of right as they never previously amended prior to dismissal." Id. at 63.
 At oral argument, we asked appellants' counsel what additional facts or legal theories that they would plead if given the opportunity on remand:
 THE COURT: . . . What is it you want to replead? What was it you would have pleaded that you didn't plead.
 APPELLANTS' COUNSEL: Well, I believe that we have pleaded sufficiently to withstand a 12(b)(6) motion. But, you know, if, for example the Court believes that we need to more fully plead what exactly it is that Aetna was promising that it would do [--a]nd, again, I believe the Complaint sets this forth--[w]e could do that with greater particularity talking about the kind of system they didn't put in place as contrasted with the policies and practices they did have in place.
 Tr. of Oral Arg. at 29-30.
 From our colloquy, we understand appellants as requesting leave to amend in the event that we affirm the dismissal on the ground of lack of factual specificity or some other readily curable defect. However, given the facts of this case, the legal theory presented, and appellants' unequivocal position that in view of the economic harm alleged, "what the doctor does or doesn't do is irrelevant," id. at 14, it would not be possible for appellants to amend the complaint to cure the fundamental problem with the complaint as it presently reads. Compare Newark Branch, N.A.A.C.P. v. Town of Harrison, New Jersey , 907 F.2d 1408, 1417 (3d Cir. 1990) (affirming district court's finding that complaint's allegations were inadequate to demonstrate plaintiff 's associational standing, but vacating district court's order denying plaintiff 's motion for leave to amend because it "believe[d] that the proposed amendment is not facially meritless"). Thus, while we are aware, as appellants point out, that in Lorenz v. CSX Corp., 1 F.3d 1406, 1413 (3d Cir. 1993) (quoting Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 230 (1962)), we observed that " `outright refusal to grant the leave without any justifying reason' " amounts to an abuse of the court's discretion granted to it by virtue of Rule 15(a), this is not a situation in which appellants simply need to allege more specific factual information in order to overcome another defense motion to dismiss. Rather, given appellants' stated intention not to rely on allegations of individual medical harm flowing from Aetna's policies, and the law as we have stated it, plaintiffs could not file an amended pleading that would survive dismissal pursuant to Rule 12(b)(6). In the circumstances, then, we will not disturb the district court's denial of appellants' request for leave to amend, as it clearly would be futile to remand this matter to the district court for further proceedings. See Dykes v. Southeastern Pa. Transp. Auth., 68 F.3d 1564, 1572 n.7 (3d Cir. 1995) ("While plaintiff elected to appeal the dismissal of the complaint rather than seek leave to amend under Fed. R. Civ. P. 15, this fact alone does not preclude amendment of the complaint. . . . This is not a situation, however, where the complaint has been dismissed for lack of specificity or some other readily curable defect. Given the facts of this case and the law as we have stated it, amendment of the complaint will not result in its being found sufficient to withstand a renewed motion under Fed. R. Civ. P. 12(b)(6)."); cf. Foman, 371 U.S. at 182, 83 S.Ct. at 230 (stating that leave should be freely given where "the underlying facts or circumstances relied upon by the plaintiff may be a proper subject of relief ") (emphasis added).